1    ABRAHAM, FRUCHTER
       & TWERSKY, LLP
2    TAKEO A. KELLAR (Bar No. 234470)
     11622 El Camino Real, Suite 100
3    San Diego, CA 92130
     Tel. (858) 764-2580
4    Fax (858) 764-2582
     *tkellar@aftlaw.com*
5

6    Counsel for Plaintiff and the Putative Class
     *[Additional Counsel Appear on Signature Page]*

7               **UNITED STATES DISTRICT COURT**

8             **NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ROBERT LOWINGER, | Case No.: _____ |
|             Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
|     vs. | |
| SLACK TECHNOLOGIES, INC., STEWART BUTTERFIELD, ANDREW BRACCIA, EDITH COOPER, SARAH FRIAR, SHEILA JORDAN, MICHAEL MCNAMARA, JOHN O'FARRELL, and GRAHAM SMITH, | |
|             Defendants. | |

       Plaintiff Robert Lowinger ("Plaintiff"), by and through his undersigned attorneys, alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Slack Technologies, Inc. ("Slack" or the "Company") and salesforce.com, inc. (with its subsidiaries "Salesforce" or "Parent"), with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications; (c) review of news articles, shareholder communications, and postings on the Company's and Parent's websites; and (d) review of other publicly available information.

                    <u>**NATURE OF THE ACTION**</u>

      1.      Plaintiff owns shares of Slack Class A common stock, par value $0.0001 per share ("Slack Common Stock") and brings this action to cure violations of Section 14(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger of Slack and Salesforce.

2.     On December 1, 2020, Slack's board of directors (the "Board") caused Slack to enter into an Agreement and Plan of Merger (the "Merger Agreement") with Salesforce, Skyline Strategies I Inc. ("Merger Sub I"), and Skyline Strategies II LLC ("Merger Sub II" and with Merger Sub I the "Merger Subs").  The transaction referred to in the Merger Agreement (*i.e.,* the merger of Merger Sub I with and into Slack, with Slack continuing as the surviving corporation, immediately followed by a second merger of the surviving corporation into either Merger Sub II or Salesforce, with either Merger Sub II or Salesforce continuing as the surviving company) is referred to herein as the "Merger" or the "Proposed Transaction."

3.     Under the terms of the Merger Agreement, each share of Slack common stock issued and outstanding immediately prior to the effective time of the merger (the "effective time") will be converted into the right to receive 0.0776 shares of Salesforce common stock and the right to receive $26.79 in cash, without interest, plus cash in lieu of any fractional share (the "Merger Consideration").

4.     The consummation of the Proposed Transaction is subject to certain closing conditions, including the approval of the stockholders of Slack.  Salesforce expects the Proposed Transaction to close in the second quarter of its fiscal year 2022 (Salesforce's fiscal year ends on January 31).

5.     On December 23, 2020, to convince Slack's stockholders to vote in favor of the Proposed Transaction, the Board authorized the filing of the proxy statement/prospectus, which was filed by Salesforce on Form S-4 with the SEC (the "Form S-4").

6.     Defendants, in the Form S-4, tout the fairness of the Merger Consideration to the Company's stockholders.  However, they have failed to disclose material information necessary for Slack's stockholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Form S-4 materially incomplete and misleading.

7.     It is imperative that the material information that has been omitted from the Form S-4 be disclosed to Slack's stockholders prior to the forthcoming stockholder vote so that they can

properly exercise their corporate suffrage rights and determine whether to exercise their appraisal rights.  For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9.

8.     Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including holding a stockholder vote on the Proposed Transaction, unless and until the material information discussed below is disclosed to Slack's stockholders sufficiently in advance of any vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331, as Plaintiff alleges violations of Section 14(a) of the Exchange Act.

10.    In connection with the acts, omissions, conduct and wrongs alleged herein, Defendants used the mails and the means or instrumentalities of interstate commerce.

11.    Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and this is the District in which the Company maintains its principal place of business.  In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce. Moreover, Slack is headquartered in this District.

## PARTIES

12.    Plaintiff holds, and at all relevant times has held, Slack Common Stock.

13.    Defendant Slack Technologies, Inc., operates Slack, a business technology software platform that brings together people, applications, and data, and sells access to its Slack platform under a software-as-a-service model.  Slack is headquartered at 500 Howard Street, San Francisco, California 94105.  Slack Common Stock is traded on the New York Stock Exchange ("NYSE") under the symbol "WORK."

14.     Defendant Stewart Butterfield ("Butterfield"), Slack's co-founder and Chief Executive Officer ("CEO"), has served on the Board since 2009.  Defendant Butterfield holds 29.2% of the total voting power of Slack and is party to a voting agreement (the "Voting Agreement") pursuant to which, except under limited circumstances, he holds an irrevocable proxy controlling an additional 26.8% of Slack's combined voting power.

15.     Defendant Andrew Braccia has served on the Board since 2010.

16.     Defendant Edith Cooper has served on the Board since 2018.

17.     Defendant Sarah Friar has served on the Board since 2017.

18.     Defendant Sheila Jordan has served on the Board since 2019.

19.     Defendant Michael McNamara has served on the Board since 2019.

20.     Defendant John O'Farrell has served on the Board since 2011.

21.     Defendant Graham Smith has served on the Board since 2018.

22.     The Defendants named in ¶¶14-21 are collectively referred to herein as the "Individual Defendants" and, with Slack, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     Slack's Background

23.     Slack, which was founded in 2009, is a channels-based messaging platform that seeks to replace the use of email through a messaging platform that integrates with third-party applications.

24.     Slack has two classes of common stock, Class A common stock and Class B common stock.  The rights of holders of Class A common stock and Class B common stock are identical, except each share of Class A common stock is entitled to one vote while each share of Class B common stock is entitled to 10 votes and is convertible at any time into one share of Class A common stock.  Holders of Class B common stock must convert their shares of Class B common stock into shares of Class A common stock if they wish to sell their holdings.

25.     On June 20, 2019, Slack Common Stock began trading on the NYSE under the symbol "WORK" pursuant to a direct public offering ("DPO") that was not underwritten by any investment bank.

**B.     The Proposed Transaction**

**1.     Disclosure of the Proposed Transaction**

26.     Following the closing of NYSE normal trading hours on December 1, 2020, Slack, Salesforce, and Merger Subs executed the Merger Agreement.

27.     After the Merger Agreement was executed, Slack and Salesforce disclosed the transaction via a press release.  The press release stated, in pertinent part:

**Salesforce Signs Definitive Agreement to Acquire Slack**

*Combination of #1 CRM platform with the most innovative enterprise communications platform will create the operating system for the new way to work, enabling companies to grow and succeed in the all-digital world*

SAN FRANCISCO--(BUSINESS WIRE)-- Salesforce (NYSE: CRM), the global leader in CRM, and Slack Technologies, Inc. (NYSE: WORK), the most innovative enterprise communications platform, have entered into a definitive agreement under which Salesforce will acquire Slack.  Under the terms of the agreement, Slack shareholders will receive $26.79 in cash and 0.0776 shares of Salesforce common stock for each Slack share, representing an enterprise value of approximately $27.7 billion based on the closing price of Salesforce's common stock on November 30, 2020.

Combining Slack with Salesforce Customer 360 will be transformative for customers and the industry.  The combination will create the operating system for the new way to work, uniquely enabling companies to grow and succeed in the all-digital world.

"Stewart and his team have built one of the most beloved platforms in enterprise software history, with an incredible ecosystem around it," said Marc Benioff, Chair and CEO, Salesforce.  "This is a match made in heaven.  Together, Salesforce and Slack will shape the future of enterprise software and transform the way everyone works in the all-digital, work-from-anywhere world.  I'm thrilled to welcome Slack to the Salesforce Ohana once the transaction closes."

"Salesforce started the cloud revolution, and two decades later, we are still tapping into all the possibilities it offers to transform the way we work.  The opportunity we see together is massive," said Stewart Butterfield, Slack CEO and Co-Founder.  "As software plays a more and more critical role in the performance of every organization, we share a vision of reduced complexity, increased power and flexibility, and ultimately a greater degree of alignment and organizational agility.  Personally, I believe this is the most

strategic combination in the history of software, and I can't wait to get going."

Acquisition to Create the Operating System for the New Way to Work

The events of this year have greatly accelerated the move by companies and governments to an all-digital world, where work happens wherever people are—whether they're in the office, at home or somewhere in between.  They need to deliver connected experiences for their customers across every touchpoint and enable their employees to work seamlessly wherever they are.

Together, Salesforce and Slack will give companies a single source of truth for their business and a unified platform for connecting employees, customers and partners with each other and the apps they use every day, all within their existing workflows.

Slack to Become the New Interface for Salesforce Customer 360

Salesforce is the #1 CRM that enables companies to sell, service, market and conduct commerce, from anywhere.  Slack brings people, data and tools together so teams can collaborate and get work done, from anywhere.  Slack Connect extends the benefits of Slack to enable communication and collaboration between a company's employees and all its external partners, from vendors to customers.

Slack will be deeply integrated into every Salesforce Cloud.  As the new interface for Salesforce Customer 360, Slack will transform how people communicate, collaborate and take action on customer information across Salesforce as well as information from all of their other business apps and systems to be more productive, make smarter, faster decisions and create connected customer experiences.

Slack To Expand Enterprise Footprint as Part of the World's #1 CRM

Slack serves leading organizations in every industry around the world, from the fastest growing startups to Fortune 500 companies, such as Starbucks, Target and TD Ameritrade, along with leading academic institutions, non-profits, and governments in more than 150 countries.

As part of the world's #1 CRM, Slack will be able to expand its presence in the enterprise, not just among Salesforce customers, but for any company undergoing digital transformation.  Upon the close of the transaction, Slack will become an operating unit of Salesforce

and will continue to be led by CEO Stewart Butterfield.

Combination to Form the Largest Open Ecosystem of Apps and Workflows for Business

Connecting people and data across systems, apps and devices is one of the biggest challenges companies face in today's all-digital world.

Slack's open platform seamlessly integrates with more than 2,400 apps that people use to collaborate, communicate and get work done. With the largest enterprise app ecosystem, the Salesforce platform is the easiest way to build and deliver apps to connect with customers in a whole new way.

Together, Salesforce and Slack will create the most extensive open ecosystem of apps and workflows for business and empower millions of developers to build the next generation of apps, with clicks not code.

Details on the Proposed Transaction

The board of directors of each of Salesforce and Slack have approved the transaction and the Slack board recommends that Slack stockholders approve the transaction and adopt the merger agreement.  The transaction is anticipated to close in the second quarter of Salesforce's fiscal year 2022, subject to approval by the Slack stockholders, the receipt of required regulatory approvals and other customary closing conditions.

Salesforce has also entered into a voting agreement with certain stockholders of Slack common stock, under which each such stockholder has agreed to vote all of their Slack shares in favor of the transaction at the special meeting of Slack stockholders to be held in connection with the transaction, subject to certain terms and conditions.  The Slack shares subject to the agreement represent approximately 55% of the current outstanding voting power of the Slack common stock.

Salesforce expects to fund the cash portion of the transaction consideration with a combination of new debt and cash on Salesforce's balance sheet.  Salesforce has obtained a commitment from Citigroup Global Markets Inc., Bank of America, N.A. and JPMorgan Chase Bank, N.A. for a $10.0 billion senior unsecured 364-day bridge loan facility, subject to customary conditions.

About Salesforce

Salesforce, the global CRM leader, empowers companies of every size and industry to digitally transform and create a 360° view of

their customers.  For more information about Salesforce (NYSE: CRM), visit: www.salesforce.com.

Any unreleased services or features referenced in this or other press releases or public statements are not currently available and may not be delivered on time or at all.  Customers who purchase Salesforce applications should make their purchase decisions based upon features that are currently available.  Salesforce has headquarters in San Francisco, with offices in Europe and Asia, and trades on the New York Stock Exchange under the ticker symbol "CRM." For more information please visit https://www.salesforce.com, or call 1-800-NO-SOFTWARE.

About Slack

Slack has transformed business communication.  It's the leading channel-based messaging platform, used by millions to align their teams, unify their systems, and drive their businesses forward.  Only Slack offers a secure, enterprise-grade environment that can scale with the largest companies in the world.  It is a new layer of the business technology stack where people can work together more effectively, connect all their other software tools and services, and find the information they need to do their best work.  Slack is where work happens.

Slack and the Slack logo are trademarks of Slack Technologies, Inc. or its subsidiaries in the U.S. and/or other countries.  Other names and brands may be claimed as the property of others.

Advisors

BofA Securities, Inc. is serving as exclusive financial advisor to Salesforce and Wachtell, Lipton, Rosen & Katz and Morrison & Foerster LLP are serving as legal counsel to Salesforce.  Qatalyst Partners LP and Goldman Sachs & Co LLC are serving as financial advisors to Slack.  Latham & Watkins LLP and Goodwin Procter LLP are serving as legal counsel to Slack.

## 2. The Proposed Transaction's Preclusive Deal Provisions

28.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Slack.

29.     Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict non-solicitation provision that prevents the Company from soliciting other potential acquirers; (ii)

an information rights provision that requires the Company to disclose to Salesforce the identity of any competing bidder and to furnish Salesforce with any competing bid within twenty-four hours of receipt; (iii) a matching rights provision which gives Salesforce four business days to match any unsolicited superior acquisition proposal the Board receives; and (iv) a provision that requires the Company to pay Salesforce a termination fee of $900 million if the Company, among other things, signs an alternative acquisition agreement.

30.    These deal protection provisions, particularly considered collectively in light of the circumstances, substantially and improperly limited Slack's ability to investigate or pursue superior proposals and alternatives.

31.    Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Slack's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

### 3.    Interests of the Officers and Directors of Slack in the Merger

32.    As acknowledged by the Form S-4, "the directors and executive officers of Slack have interests in the mergers that may be different from, or in addition to, the interests of Slack stockholders generally."

33.    The Form S-4 discloses that "in connection with the merger agreement" Defendant Butterfield, along with Slack employees Cal Henderson and Tamar Yehoshua, entered into offer letters with Salesforce.  As to Defendant Butterfield, pursuant to an employment agreement, he will serve as President and Chief Executive Officer of Slack, be entitled to an annual base salary of $650,000 and have a target annual bonus opportunity under the Salesforce Gratitude Bonus Plan of 100% of his annual base salary.  In addition, Defendant Butterfield stands to receive golden parachute compensation of $93,770,107.

34.    Defendant Butterfield is party to the Voting Agreement, as noted above, giving him control of 55.9% of Slack's voting power.  The Form S-4 states that "[w]e do not believe that the parties to these voting agreements constitute a 'group' under Section 13 of the Exchange Act" but

does not disclose the terms of the Voting Agreement or the "limited circumstances" pursuant to which the proxies are revocable.

## C.   <u>MATERIAL OMISSIONS IN THE FORM S-4</u>

35.     Defendants were obligated to carefully review the Form S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any materially false and misleading statements or material misrepresentations or omissions.  However, the Form S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) of the Exchange Act.

### 1.     Material Omissions Relating to the Merger's Background Process

36.     As noted above, the Form S-4 discloses that "In connection with the merger agreement and contingent upon the closing of the mergers, each of Stewart Butterfield, Cal Henderson and Tamar Yehoshua (together the "Slack Executive Officers") entered into offer letters with Salesforce pursuant to which Mr. Butterfield will serve as President and Chief Executive Officer of Slack, Mr. Henderson will serve as Chief Technology Officer of Slack and Ms. Yehoshua will serve as Chief Product Officer of Slack."

37.     The Form S-4 fails to set forth any of the employment related discussions and negotiations that occurred between Salesforce and the Slack Executive Officers, including who participated in all such communications, when they occurred, and their content.  The Form S-4 further fails to disclose whether any of Salesforce's prior proposals or indications of interest mentioned management retention.  The extent to which the Slack Executive Officers presented to the Board or participated in due diligence with Salesforce while negotiating employment agreements is also undisclosed.

38.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

### 2. Material Omissions Relating to Financial Projections

39.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading.

40.     On May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.  One of the new C&DIs on forward-looking information, such as financial projections, requires companies to provide any reconciling metrics that are available without unreasonable efforts.

41.     The Form S-4 discloses, in table form, forecasts for Slack (the "Projected Financial Information") including Non-GAAP Gross Profit, Non-GAAP Operating Income (Loss), Unlevered Free Cash Flow ("UFCF"), and Unlevered Free Cash Flow Less Stock-Based Compensation.

42.     To make the projections included on pages 68-69 of the Form S-4 complete and not materially misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures or provide complete and full disclosure of the line-item projections for the metrics used to calculate those non-GAAP metrics.

43.     Failure to provide complete and full disclosure of the Projected Financial Information leaves Slack stockholders without the necessary, material information to reach a fully informed decision concerning the Company, the fairness of the merger consideration, and whether to vote in favor of the Proposed Transaction.

44.     Because Defendants have disclosed some of the financial information relied upon by Slack's financial advisors, they may not omit line items that are critical to fully understanding that information without rendering the Form S-4 materially misleading.

### 3. Material Omissions Relating to Financial Analyses

45.     The Proxy Statement explains that Slack engaged Qatalyst Partners LP ("Qatalyst") and Goldman Sachs & Co. LLC ("Goldman" and with Qatalyst the "Financial Advisors") to provide financial advice in connection with potential strategic transactions, and particularly the Merger.

46.     The Financial Advisors presented the Board with several financial analyses in connection with rendering their opinion as to the fairness, from a financial point of view, of the Proposed Transaction.  However, the descriptions of the Financial Advisors' fairness opinions and analyses set forth in the Form S-4 omit key underlying inputs and assumptions, preventing Slack's stockholders from sufficiently understanding these analyses and determining what weight, if any, to place on the analyses in casting votes in favor of, or against, the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Slack's stockholders.

47.     Qatalyst's *Discounted Cash Flow Analysis*, presented on pages 72-73 of the Form S-4, omits: (a) the line items used to calculate unlevered free cash flows; (b) the inputs and assumptions used to derive a discount rate between 8.25% and 9.75%, based on an estimated weighted average cost of capital for Slack; (c) the terminal value used for Slack; (d) Qatalyst's basis for applying a range of fully diluted enterprise value to next-12-month's estimated UFCF multiples of 30.0x to 45.0x; (e) cash and cash equivalents of Slack as of October 31, 2020; (f) the number of fully diluted outstanding shares of Slack Common Stock as of October 31, 2020; (g) the face value of Slack's outstanding convertible debt as of October 31, 2020, and; (h) the value of Slack's non-controlling interest as of October 31, 2020.

48.     Qatalyst's *Selected Companies Analysis*, presented on pages 73-74 of the Form S-4, omits: (a) the analyst projections of revenue considered by Qatalyst, and (b) the fully diluted share count used.

49.     Qatalyst's *Selected Transactions Analysis*, presented on pages 74-76 of the Form S-4, omits: (a) the fully diluted share count as used, (b) the effects of assuming cash settlement of the convertible notes with an assumed make-whole adjustment and cash settlement of the capped calls based on a Black-Scholes option calculation model, and (c) the parameters used for selecting comparable companies, which includes seven transactions that Goldman did not utilize and omits five transactions that Goldman utilized.

50.     Goldman's *Implied Premia and Multiple Analysis*, presented on pages 79-80 of the Form S-4, omits:(i) the total number of fully diluted shares of Slack Common Stock outstanding;

and (ii) Slack's net debt (including amounts associated with the assumed conversion of the convertible notes at their original conversion rate less amounts assumed to be received by Slack pursuant to the capped call transactions entered into by Slack in connection therewith) and non-controlling interests less cash.

51.     Goldman's *Illustrative Discounted Cash Flow Analysis*, presented on pages 80-81 of the Form S-4, omits: (a) the line items used to calculate unlevered free cash flows; (b) the inputs and assumptions used to derive a discount rate between 6.5% to 9.5%, reflecting estimates of Slack's weighted average cost of capital but differing significantly from the 8.25% to 9.75% range Qatalyst determined to reflect the weighted average cost of capital; (c) the terminal value used for Slack; (d) Goldman's basis for applying an illustrative range of terminal year multiples of 25.0x to 35.0x to an assumed terminal year next twelve month ("NTM") unlevered free cash flow (which analysis implied perpetuity growth rates ranging from 2.3% to 6.3%); (f) the number of fully diluted outstanding shares of Slack Common Stock used; (g) Slack's net debt used, and; (h) the net present value of the net operating losses using an illustrative discount rate of 8.0% used by Goldman.

52.     Goldman's *Illustrative Present Value of Future Share Price Analysis*, presented on page 81 of the Form S-4, omits: (a) its basis for applying enterprise value to NTM revenue multiples of 16.0x to 20.0x to NTM revenue estimates for Slack for each of the fiscal years 2022 to 2024, and (b) the bases and assumptions behind using an illustrative discount rate of 8.0%.

53.     Goldman's *Selected Transactions Analysis*, presented on pages 81-82 of the Form S-4, omits the parameters used for selecting comparable companies, which includes five transactions that Qatalyst did not utilize and omits seven transactions that Qatalyst utilized.

54.     Goldman's *Premia Analysis*, presented on page 82 of the Form S-4, omits the premia and transactions observed by Goldman Sachs in reaching its conclusion.

55.     Goldman's *Selected Companies Analysis*, presented on pages 83-84 of the Form S-4, omits the individual multiples and metrics observed by Goldman Sachs in reaching its conclusion.

56.     When an investment bank's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

## COUNT I

### AGAINST ALL DEFENDANTS
### FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
### AND RULE 14-9 PROMULGATED THEREUNDER

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. §78n(a)(1).

59.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

60.     Defendants have issued the Form S-4 with the intention of soliciting stockholders' support for the Proposed Transaction.  Each Defendant reviewed and authorized the dissemination of the Form S-4, which fails to provide critical information regarding, among other things, the background of the transaction and financial projections for the Company.

61.     In so doing, Defendants omitted material facts necessary to make the statements made not misleading.  Each Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Form S-4, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

62.     Defendants knew or were negligent in not knowing that the Form S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

63.     Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Form S-4, rendering the sections of the Form S-4 identified above materially incomplete and misleading.  Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Form S-4 and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

64.     Defendants were, at the very least, negligent in preparing and reviewing the Form S-4.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Form S-4 or failing to notice the material omissions in the Form S-4 upon reviewing it, which they were required to do carefully as the Company's directors.

65.     The misrepresentations and omissions in the Form S-4 are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

66.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

A.     Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Form S-4;

B.     Directing Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

Dated: January 7, 2021             By:     /s/ Takeo A. Kellar
                                                   TAKEO A. KELLAR
                                                   11622 El Camino Real, Suite 100
                                                   San Diego, CA 92130
                                                   Tel: (858) 764-2580
                                                   Fax: (858) 764-2582

                                                   -AND-

                                                   MICHAEL J. KLEIN
                                                   (mklein@aftlaw.com)
                                                   One Penn Plaza, Suite 2805
                                                   New York, NY 10119
                                                   Tel: (212) 279-5050
                                                   Fax: (212) 279-3655